

FILED
Jul 09, 2026
12:53 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Jessie Harris | Docket No. 2025-60-7980 |
| v. | State File No. 74312-2025 |
| Express Employment Professionals, et al. | |
| Appeal from the Court of Workers' Compensation Claims Kenneth M. Switzer, Chief Judge | Heard June 9, 2026 in Nashville |

---

### Affirmed and Remanded

---

The employer, a temporary staffing agency, questions the trial court's award of medical benefits and attorneys' fees in this interlocutory appeal. The employee was working for the employer's client when he was pinned by machinery, causing numerous injuries and requiring emergency medical treatment. The employer later sent the employee to a walk-in clinic, where the provider referred the employee to a variety of specialists. The employer provided a panel to honor one of the referrals but denied the others. The employer then denied the claim in its entirety, citing the employee's alleged illegal drug use and willful misconduct as affirmative defenses. After an expedited hearing, the trial court ordered the employer to continue to provide medical treatment, including ongoing treatment with the authorized physician, and panels related to the referrals that had been denied. It further awarded the employee attorneys' fees due to the employer's unreasonable failure to timely initiate medical benefits. The employer has appealed. Having carefully reviewed the record and having heard the arguments of counsel, we affirm the trial court's award in its entirety and remand the case.

Judge Meredith B. Weaver delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

Katherine X. Hinkle and Gregory H. Fuller, Knoxville, Tennessee, for the employer-appellant, Express Employment Professionals

Adam C. Brock-Dagnan, Nashville, Tennessee, for the employee-appellee, Jessie Harris

**Factual and Procedural Background**

Express Employment Professionals ("Employer") is a temporary staffing agency contracted by a manufacturer of custom art supplies, Crescent Brands, LLC a/k/a Bainbridge Molding ("Crescent"), to fill its staffing needs. Jessie Harris ("Employee"), who was 24 years old at the time of the accident, started working for Employer intermittently when he was 18. Employer had most recently assigned Employee to work for Crescent as a "racker," which required him to move and hang large strips of aluminum for dyeing and labeling.

Approximately one month after his assignment began, Employee was moved to the position of "anodizing technician." In this position, Employee was responsible for monitoring and operating automated cranes at the facility that are used to move aluminum during the dyeing process, helping maintain the drainage systems and dye tanks, and performing quality control checks on the dyed aluminum. On a typical workday, Employee worked from a catwalk, checking the dye quality on the aluminum as the cranes moved it from the dye tanks to the rinse tanks and then to the completed product area. The cranes operated automatically to move the aluminum from place to place, and they occasionally malfunctioned, requiring workers such as Employee to either shut off the cranes or put them in manual mode for maintenance to repair them.

On October 14, 2025, Employee was working with Anthony Buck, his supervisor, and Ronnie Loftis, an anodizing technician helping train Employee. Employee was advised that Tank 27 was leaking, and Mr. Buck tasked Employee with repairing the plumbing in the tank, which required multiple attempts before the repair was successful. During their lunch break, Employee asked Mr. Buck if he should check the tank to see if it was still leaking. According to Employee, Mr. Buck indicated Employee could check the tank "if [he] wanted to" and requested he do so when he returned to work from his break "if [he didn't] mind."

Finding no leaks under and around Tank 27, Employee went up the stairs to the catwalk to observe the rate at which the tank was filling. He turned to walk away from the tank and was approximately six inches from the tank when crane number three forcefully pushed him into the side of the tank, pinning him there. Employee described feeling three of his ribs break before losing consciousness. He was life-flighted to TriStar Skyline Hospital where providers noted Employee's broken ribs, altered mental state, lacerated liver, and pneumothorax, a condition in which air leaks into the space between the lung and the chest wall (commonly called a "collapsed lung"). After undergoing evaluation and treatment of these conditions, he was released to go home on October 16, 2025.

Thereafter, Employee went to Macon Community Hospital's emergency room on October 19 complaining of chest pain, shortness of breath, and severe headache. CT scans of his head and chest were normal, and the hospital released him with instructions to follow

up with his primary care physician.  Employer authorized Employee to visit Crossroads, a walk-in clinic, on October 28, where he saw Nurse Practitioner Aleaha Carey.  At that time, he described the event on October 19 as an apparent panic attack and indicated he was having "anxiety in general since the accident" and that his "mental health [was] a worry." NP Carey also noted repeated elevated blood pressure readings, which Employee denied having had prior to the accident.  She requested he use a blood pressure monitor at home and diagnosed essential hypertension.  Employee reported that, despite using "incentive spirometry" at home as instructed upon discharge from Tristar Skyline, he was still having issues taking a deep breath.[1]  He also described upper back pain and continued pain from his broken ribs.  Finally, he complained of significant headaches since the accident.  NP Carey prescribed hydroxyzine for his anxiety, refilled prescriptions for his pain reliever and muscle relaxer, referred him to "[p]ulmonology, [n]eurology, [p]sych/[m]ental health, [and] [o]rtho," and instructed him to follow up with her in three weeks.  The supervising physician, Dr. John Pennington, reviewed and signed the Crossroads medical record that included the referrals on October 30, 2025.

Employer honored the referral to an orthopedic physician and provided a panel to Employee on October 31, from which Employee selected Dr. James Fish.  At his initial appointment on November 19, 2025, Dr. Fish diagnosed Employee with thoracic radiculitis, cervical spondylosis with radiculopathy, and lumbosacral spondylosis with radiculopathy, and requested a thoracic MRI.  The MRI was completed in December, but the record does not contain any more clinician notes or the results of that MRI.[2]

In January 2026, Employee filed a request for an expedited hearing, seeking to compel Employer to provide specialist panels for the other referrals.  Employer forwarded correspondence to Dr. Fish that same month with numerous questions regarding Employee's diagnoses and anticipated medical care, which Dr. Fish signed and returned on February 24.  Dr. Fish marked that he was Employee's authorized treating physician on the questionnaire and stated Employee's diagnoses were "rib fractures, thoracic pain, and thoracic radiculopathy."  He did not respond to an inquiry as to whether "this [was] the only diagnosis that is reasonably related to the incident that occurred on October 14, 2025." Dr. Fish denied that Employee had misrepresented any medical history to him.  Employer attached medical records from Employee's treatment as a child and teenager at Vanderbilt Children's Clinic for attention deficit hyperactivity disorder ("ADHD") and requested that Dr. Fish review the records for what it described as indications of preexisting anxiety, depression, and hypertension.  Employer then asked, "If [Employee] did express having

_____

[1] "Incentive spirometry" is a breathing exercise technique that encourages patients to take slow, deep breaths to maximize lung expansion and improve respiratory function.  It is often used after surgery or in patients with lung conditions to prevent complications.  *See* www.yalemedicine.org/clinical-keywords/incentive-spirometry (last visited July 6, 2026).

[2] The remaining medical records in the record from Dr. Fish include a referral to physical therapy and a work status note, but no clinician's notes are contained in the record other than the November 19 visit.

these long-term [preexisting] conditions, would these referrals fall under the care for his work incident that occurred on October 14, 2025?" Dr. Fish marked "Yes" in response to that question but then marked "No" when asked if the "three additional referrals [were] 'reasonable and necessary medical care' in relation to [Employee's] work incident," explaining that "[Employee] sustained a significant crush injury with multiple fractures. He will heal in time [and] not need long term care." The questionnaire then asked whether the referrals are necessary, to a reasonable degree of medical certainty, "to treat any injuries or the condition [Employee] sustained" from the work accident. Dr. Fish marked "No" and wrote: "[Employee] is stable from a psychological, neurological[,] [and] pulmonary perspective."[3]

As the claim progressed, Employer received the medical records from Tristar Skyline, Macon Community Hospital, and Crossroads, all of which indicated Employee tested positive for THC, or cannabis, at the time of their treatment of Employee. Upon receipt of that information, Employer denied the claim as a whole, citing intoxication and willful misconduct as affirmative defenses. It also alleged Employee suffered from preexisting conditions of hypertension and ADHD. It ceased authorization of treatment with Dr. Fish on March 3, 2026.

Employee and two witnesses testified at the expedited hearing, which was held one week later. Employer argued that Employee was under the influence of cannabis at the time of the accident and that he was in violation of company policy by being on the catwalk when the cranes were in automated status. Employer further argued that Employee's pediatric medical records indicated a preexisting history of hypertension, depression, and mental health issues, apparently based on his previous ADHD diagnosis.

Employee testified that, on the date of the accident, he and Mr. Loftis had drained Tank 27 in order to repair a leak in the tank. According to Employee, he, Mr. Loftis, and Mr. Buck took their lunch break "not too long after that." Employee then described the following conversation:

> I spoke with [Mr. Buck] to see if he wanted me to go check it – check on it. And he said I could if I wanted to, just to make sure it wasn't leaking, [because] it had already been leaking. And I – I made the comment about it having more fluid would mean there's more pressure behind the – the valve basically. So[,] he said, "Yeah, go ahead and check it when you get back from break, if you don't mind."

Employee testified that, after looking at the tank from the side, he climbed the stairs of the catwalk to look at how the tank was filling from above. Employee stated that the

---

[3] The questionnaire asked other questions regarding the referrals, restrictions, and maximum medical improvement, none of which are relevant to this appeal.

crane was about forty feet away from him when he climbed up to the catwalk and that, because there were no items to be carried or picked up, the crane should not have moved. However, it did move, forcefully pinning him against the tank and causing serious injuries. Employee testified that, when working on the catwalk, there was a "buddy system" in place; one person was present to watch the cranes while the other person performed the work. On the date of the accident, Employee believed that Mr. Loftis was on the catwalk and watching the cranes. Employee testified that the cranes malfunctioned periodically, although it is unclear from his testimony the frequency of those alleged malfunctions.

Regarding the cannabis detected in his system by his medical providers, Employee testified he had an "edible" in late September 2025 but asserted that he consumed it at home "on [his] own time." He denied ever reporting to work intoxicated or under the influence of cannabis. He stated that although he was drug tested when Employer initially hired him in 2020, he did not recall receiving any written materials or any training concerning a Drug-Free Workplace Program. Although he acknowledged being aware that using drugs while working was prohibited, he contended he did not know that it could impact his ability to receive workers' compensation benefits.

Finally, with respect to Employer's assertions about a preexisting mental health condition, Employee testified during cross examination that he had used ADHD medication as a teenager for approximately four or five years, a side effect of which was "anger issues." However, he denied any treatment or use of medications for ADHD "in several years." Specifically, Employee testified he has "not had any signs nor reason to need medication for my ADHD."[4]

Employer called Joe Gunnels, Crescent's plant manager, who testified that Employee should not have been on the catwalk while the crane was operating in its automated mode. He testified it was a "rule" discussed in training that employees remain on the "operational side" of the crane, which would allow them to put the crane in manual mode if necessary. He further testified that anodizing technicians should be aware of the cranes' movements at all times and that there had been no known malfunctions of any of the cranes on the date of the accident. He disagreed with Employee's testimony that there was a "buddy system" and contended that it was each individual's job to watch the cranes' movements, but he conceded on cross examination that Employee was still in training and that some people need more training than others. Mr. Gunnels admitted that training occurred on the job and that it took about two months to learn how to be an anodizing technician. He further agreed that he had no reason to believe Employee willfully "went against the orders of the job" when he inspected the tank to ensure the repairs he had performed were sufficient.

---

[4] In response to an objection to Employer's line of questioning addressing Employee's prior ADHD diagnosis, the court agreed with Employee that the ADHD diagnosis was irrelevant and sustained the objection. That evidentiary ruling was not included as an issue on appeal.

Employer's second witness was Mr. Loftis, who had assisted in training Employee and was present at the time of the accident. He testified that it was "company policy" for anodizing technicians to remain on the "control" side of the cranes and that the cranes be switched into manual mode before a technician could check a rack or be on the other side of the crane. He was not asked about Employee's testimony regarding the "buddy system" or whether he was supposed to be watching the cranes while Employee was looking in the tank.

Employer also presented as evidence a memorandum from July 2025 confirming the acceptance of its application to Tennessee's Drug-Free Workplace Program. The document contained the following disclaimer: "By accepting this application, the State of Tennessee is not certifying the accuracy or completeness of either your application or your Drug-Free Workplace Program." Furthermore, Employer offered no evidence of the amount of THC detected in any of Employee's positive drug tests.[5]

Following the hearing, the court issued an order awarding medical benefits, including panels for all the specialties sought by Employee, and attorneys' fees for an unreasonable denial of benefits. The trial court found Employee to be a credible witness and stated Employer was unlikely to prevail at trial in establishing its affirmative defenses. Specifically, the court found Employer had not established that Employee had actual knowledge of any specific safety rule or policy requiring him to remain on the "non-operational" side of the crane or of the possible danger from not following that rule. It pointed out that Employer did not submit any evidence of a written policy in support of its defense. The court further noted that Employee was operating under the instruction of his supervisor at the time of the accident and that the supervisor did not testify at the hearing. Similarly, the trial court determined Employer did not offer sufficient evidence at this stage in the litigation to establish: (1) its compliance with the requirements of the Certified Drug-Free Workplace Program; (2) the levels of THC in Employee's system at any relevant time; and (3) any causal link between Employee's alleged cannabis use and the accident.

In response to Employer's argument that the authorized treating physician, Dr. Fish, had declined to refer Employee to specialists in psychiatry, neurology, and pulmonology, the trial court determined the referrals had been made by an authorized provider several months before Dr. Fish's evaluation and had been approved by that provider's supervising physician, Dr. Pennington, and, thus, must be honored. Finally, the court determined that Employer unreasonably failed to initiate medical benefits by declining to give panels for three of the referrals and, as such, Employee was entitled to attorneys' fees. Employer has appealed.

---

[5] According to Tenn. Comp. R. & Regs. 0800-02-12-.03(14), an "initial drug test" must comply with regulations adopted by the United States Department of Transportation, which set "cutoff concentrations" for various substances, including marijuana metabolites. *See* 49 C.F.R. §§ 40.85 - 40.87 (2023).

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2025). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to credibility determinations made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "when it comes to deposition testimony, an appellate panel is in the same position as the trial court to make credibility determinations." *Edwards v. Peoplease, LLC*, No. W2024-01034-SC-R3-WC, 2025 Tenn. LEXIS 514, at *18 (Tenn. Dec. 22, 2025). Thus, when medical proof is presented by deposition, "the reviewing court may draw its own conclusions about the weight and credibility of the expert testimony." *Id.* Moreover, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2025).

**Analysis**

On appeal, Employer contends the trial court "misconstrued" the evidence supporting its willful misconduct defense and erred in awarding attorneys' fees at an interlocutory stage of the case. In contrast, Employee urges that the trial court's order be affirmed and avers that Employer's appeal is frivolous.

*Willful Misconduct*

With respect to its willful misconduct defense, Employer asserts that the actions Employee took to inspect the tank without making the cranes inoperable amounted to willful misconduct such that workers' compensation benefits are barred.[6] *See* Tenn. Code Ann. § 50-6-110(a)(1). When raising an affirmative defense contemplated in Tennessee Code Annotated section 50-6-110(a), the burden of proof is on the employer to establish such a defense. Tenn. Code Ann. § 50-6-110(b). The Tennessee Supreme Court has established a four-pronged test that an employer must satisfy to prevail on an affirmative defense of willful misconduct. Specifically, the employer must establish: (1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide

---

[6] For purposes of this appeal, Employer has not challenged the court's findings related to its intoxication defense or its status as a Certified Drug-Free Workplace, but it does rely on the positive drug screens as support for its willful misconduct defense.

7

enforcement of the rule; and (4) the employee's lack of a valid excuse for violating the rule. *Mitchell v. Fayetteville Pub. Utils.*, 368 S.W.3d 442, 453 (Tenn. 2012). In a previous opinion discussing *Mitchell*, we observed that,

> [i]n evaluating [the employee's] violation of the pertinent safety rule in that case, the Supreme Court concluded, "his acknowledgment that he elected to take off [the protective gloves] anyway clearly established that his act was willful – and not merely negligent or reckless." Thus, the Supreme Court in *Mitchell* reinforced longstanding precedent that an employee's negligent or reckless actions generally are not enough to defeat a claim for workers' compensation benefits.

*Roper v. Allegis Group*, No. 2016-01-0546, 2017 TN Wrk. Comp. App. Bd. LEXIS 14, at *11 (Tenn. Workers' Comp. App. Bd. Feb. 10, 2017) (internal citation omitted). Moreover, as we have explained previously, "[i]t is axiomatic that to succeed with [a willful misconduct] defense, the employer must also establish that there was, in fact, a violation of a safety rule." *Id.* at *7.

In the case at hand, Employer has not provided sufficient evidence at this stage of the litigation that the alleged safety rule existed, that there was a violation of the alleged rule, that there was bona fide enforcement of that rule, or that Employee had actual knowledge of the rule. Employee testified he had no knowledge of any rule or policy stating that he was supposed to stay on the manual side of the cranes, and neither of Employer's witnesses testified that they personally informed him of the alleged rule. Furthermore, Employee's supervisor was not present to testify as to any training or discussion about the rule, and Employer did not present a handbook or written policy articulating that rule. Therefore, we agree with the trial court that Employer has not met its burden of proving it will likely prevail at trial on its affirmative defense of willful misconduct such that it impacts Employee's likelihood of success at trial.

*Attorneys' Fees*

Employer next contends the trial court improperly awarded Employee attorneys' fees at this stage of litigation. Tennessee Code Annotated section 50-6-226(d)(1)(B) states that attorneys' fees may be awarded by the Court of Workers' Compensation Claims when an employer "unreasonably fails to timely initiate any of the benefits to which the employee . . . is entitled . . . if the workers' compensation judge makes a finding that the benefits were owed at an expedited hearing or compensation hearing." We have previously stated that,

> [g]iven the twists and turns inherent in litigation, it seems the better practice is to resolve such issues after the litigation has run its course and the parties and the court no longer face uncertainties over future developments, as

opposed to adjudicating disputes concerning attorney's fees and expenses in piecemeal fashion as the case winds its way through the litigation process.

*Andrews v. Yates Services, LLC*, No. 2016-05-0854, 2017 TN Wrk. Comp. App. Bd. LEXIS 35, at \*7-8 (Tenn. Workers' Comp. App. Bd. May 23, 2017). "This is not to suggest that a determination of attorney[s'] fees and expenses may never be proper prior to the conclusion of a case, as each case must be evaluated based on the particular circumstances presented." *Id.* at \*8.[7]

Prior to 2023, to support an award of attorneys' fees, the statute required that the trial judge find the employer "wrongfully" denied or failed to timely initiate benefits, which the statute defined as "erroneous, incorrect, or otherwise inconsistent with the law or facts." *See* Tenn. Code Ann. § 50-6-226(d)(1)(B) (2021). However, in 2023, the General Assembly amended that statutory provision to delete the word "wrongfully" and insert the word "unreasonably," thus permitting an award of attorneys' fees if an employer "unreasonably" denied or failed to initiate benefits timely. The legislature did not include a definition of "unreasonably" in the amended statute, and the present appeal is the first time we have been called on to analyze the meaning of that amended sentence.

Our Supreme Court has given us ample guidance regarding the interpretation of statutes. First, "we seek to 'ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Falls v. Goins*, 673 S.W.3d 173, 180 (Tenn. 2023) (quoting *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020)). "[T]he statutory language is of primary importance" in performing that task. *Flade v. City of Shelbyville*, 699 S.W.3d 272, 285 (Tenn. 2024). We must give the words contained in the statute "their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 839 (Tenn. 2019). When those words are clear and unambiguous, we derive the legislative intent from the plain meaning of the statutory language and simply enforce the statute as written. *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022). If, however, the statutory language is ambiguous, we may consider other

---

[7] Recently, this subsection was amended to read as follows:

> When, at an expedited hearing, the workers' compensation judge concludes under subdivision (d)(2) that the employer unreasonably denied the claim or unreasonably failed to timely initiate benefits, the court may award attorneys' fees and costs at that time. If, in addition, the workers' compensation judge finds that the evidence of such unreasonableness is clear and convincing, then any award of attorneys' fees and costs under subdivision (d)(2) must not be deferred to a compensation hearing. The interlocutory nature of an expedited hearing order does not, standing alone, serve as a basis to deny or defer an award of attorneys' fees and costs under this subdivision (d)(3).

Tenn. Code Ann. § 50-6-226(d)(3) (2026). However, this amendment took effect July 1, 2026, and thus does not apply to the instant case.

sources to discern the legislative intent. *In re Bentley D.*, 537 S.W.3d 907, 912 (Tenn. 2017). Finally, we must "endeavor to construe statutes in a reasonable manner which avoids statutory conflict and provides for harmonious operation of the laws." *Wallace v. Metro. Gov't of Nash. & Davidson Cnty.*, 546 S.W.3d 47, 52-53 (Tenn. 2018) (quoting *Ray v. Madison Cnty.*, 536 S.W.3d 824, 831 (Tenn. 2017)).

We conclude that the absence of a statutory definition for "unreasonably" creates potential ambiguity. Thus, we turn to sources other than the statutory language to determine the General Assembly's intent. Here, the legislative discussion concerning the amendment reflects that it was the General Assembly's intention to change the language to be more consistent with terminology regularly used by the courts in similar contexts. Senator Jack Johnson stated, "Rather than defining a new term and something that would . . . further have to be interpreted by the court . . . by using 'unreasonable,' that's something that the courts are . . . familiar with." *Workers' Compensation – As Enacted, Makes Various Changes to the Workers' Compensation Law: Hearing on S.B. 263 Before the S. Com. & Lab. Comm.*, 2024 Leg., 113th Sess. 90 (Tenn. 2024) (statement of Sen. Jack Johnson, S. Majority Leader, 113th Gen. Assemb.).

In light of that guidance, we look to the "plain and ordinary meaning" of the word "unreasonable" as used in this context. Black's Law Dictionary defines "unreasonable" as "[n]ot guided by reason, irrational, or capricious." Black's Law Dictionary (8th ed. 2004). In the context of a claim for attorneys' fees in a workers' compensation case, courts in other states have addressed the meaning of the word "unreasonable." For example, in a case where medical records documented injuries consistent with the employee's account of the accident, the court agreed the employer's denial was unreasonable because it lacked a "legal or factual basis." *Graham Packaging Co., LP v. Barnes*, No. 25-ICA-95, 2025 W. Va. App. LEXIS 235, at *5 (W. Va. Ct. App. Aug. 29, 2025); *see also AAAA Enterprises, Inc. v. River Place Cmty. Urb. Redevelopment Corp.*, 553 N.E.2d 597, 601 (Ohio 1990) (defining "unreasonable" as having "no sound reasoning process").

In this case, Employer did not offer a panel initially but authorized Employee to seek medical care at Crossroads, where he was referred for further evaluation by specialists in pulmonology, psychiatry, neurology, and orthopedics. Only the orthopedic referral was honored by Employer for reasons that remain unclear. Employee had to file a petition for benefits, participate in mediation, attend an expedited hearing, and respond to an appeal in order to obtain the medical benefits to which he was entitled. Employer has offered various reasons to justify its refusal to honor all but one of the referrals, none of which are persuasive. Employer has offered no statutory authority or case law supporting its position that it was reasonable to withhold medical treatment from Employee for nearly four months until it chose to submit a questionnaire and receive a response from Dr. Fish stating that Employee "is stable from a psychological, neurological, and pulmonary perspective."

We have previously provided several examples of situations in which it may be appropriate to award attorneys' fees, stating that an award of fees may be appropriate at an interlocutory stage,

> *[f]or example,* in circumstances where an employer relies on its own interpretation of medical evidence without seeking an expert medical opinion to support its interpretation, fails to take reasonable steps to investigate a claim before denying it, fails to consider evidence in favor of the injured worker, *and/or* declines to reconsider its denial of a claim in the face of newly-discovered countervailing evidence.

*Travis v. Carter Express, Inc.*, No. 2018-03-0237, 2019 TN Wrk. Comp. App. Bd. LEXIS 25, at *14 (Tenn. Workers' Comp. App. Bd. June 24, 2019) (internal citations omitted) (emphases added). During oral argument, Employer contended that the quoted passage created a four-pronged test and that all elements of the test must be met for fees to be appropriately awarded at the interlocutory stage. This misconstrues our previous statements. Instead, as noted by the term "for example," we described possible actions that can result in an award of attorneys' fees, and that description was, by its terms, not exhaustive.

Here, Employer failed to offer a panel to Employee upon his release from the hospital and instead directed him to a single provider. It then offered Employee a panel in response to one referral from the authorized provider but denied three other referrals by the same provider without explanation despite the uncontroverted fact that Employee suffered severe injuries arising out of an accident occurring in the course and scope of his employment. Although Dr. Fish indicated several months later he did not believe the additional referrals were necessary, we look to the information known by the employer/carrier "*at the time the denial decision was made.*" *Andrews v. Yates Services, LLC*, 2018 TN Wrk. Comp. App. Bd. LEXIS 22, at *12 (Tenn. Workers' Comp. App. Bd. May 8, 2018) (emphasis added). In short, when the decision to deny those referrals was made, Employer had no supportable reason to deny them, and the denial decision lacked any legal or factual basis. As such, in this instance, we agree with the trial court's assessment that Employer's withholding of medical care was unreasonable and affirm the award of attorneys' fees.

*Frivolous Appeal*

Finally, Employee seeks a determination that the appeal in this case is frivolous. It is well-settled that "[a] frivolous appeal is one that . . . had no reasonable chance of succeeding," *Adkins v. Studsvik, Inc.*, No. E2014-00444-SC-R3-WC, 2015 Tenn. LEXIS 588, at *30 (Tenn. Workers' Comp. Panel July 21, 2015), or one that is devoid of merit or brought solely for delay, *Yarbrough v. Protective Servs. Co., Inc.*, No. 2015-08-0574, 2016 TN Wrk. Comp. App. Bd. LEXIS 3, at *11 (Tenn. Workers' Comp. App. Bd. Jan. 25,

2016). "[P]arties should not be required to endure the hassle and expense of baseless litigation. Nor should appellate courts be required to waste time and resources on appeals that have no realistic chance of success." *Id.* at \*10-11 (internal citations omitted); *see also Burnette v. WestRock*, No. 2016-01-0670, 2017 TN Wrk. Comp. App. Bd. LEXIS 66, at \*18 (Tenn. Workers' Comp. App. Bd. Oct. 31, 2017). Based on the evidence presented to date, we disagree with Employee that this appeal was completely without merit and decline to find the appeal frivolous.

## Conclusion

For the foregoing reasons, we affirm the trial court's findings that Employer failed to establish the elements of its affirmative defense and that Employee came forward with sufficient proof to indicate a likelihood of prevailing at trial on the issues addressed above. Thus, we affirm the court's order requiring Employer to provide additional medical care and its award of attorneys' fees due to Employer's unreasonable denial of medical treatment, and we remand the case. Costs on appeal are taxed to Employer.